# IN THE SUPREME COURT OF TEXAS

════════════

No. 11-0554

════════════

CITY OF LORENA, TEXAS, PETITIONER,

v.

BMTP HOLDINGS, L.P., RESPONDENT

════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TENTH DISTRICT OF TEXAS

════════════════════════════════════════

JUSTICE HECHT, joined by CHIEF JUSTICE JEFFERSON, dissenting.

The way the Court begins its opinion — "[m]unicipalities must ensure that essential public facilities are available to their residents"[1] — the ending comes as a surprise: "a moratorium regarding a shortage of essential public facilities must not affect approved development."[2]  To be honest, the Court should begin instead: "Municipalities cannot ensure that essential public facilities are available to their residents if it interferes with approved development.  The Legislature has forbidden it."  Surely the staunchest cynic of the legislative process would pause to accuse the Legislature of preferring development over, say, sewage in the streets — development run amuck, as it were.

What can a city do to prevent continuing development from depriving residents of essential public facilities?  Two things.  It can waste tax revenues on buying out the developer or litigating

---

[1] *Ante* at ___.

[2] *Ante* at ___.

with him (probably unsuccessfully, as I will explain, but nevertheless expensively), instead of spending the funds to improve facilities so that development can continue without threatening public health and safety, thereby benefitting both the developer and the public. Or it can just let matters run their course, polluting the environment and endangering the public. The Court's solution to this predicament is for cities to be very careful — reluctant, even — in approving development — a wonderful irony in a case won by a developer. Which is all well and good, except that nothing suggests the city in this case was promiscuous in approving development, and in any event, the unexpected may occur — it may have in this case — and facilities that seemed adequate when development was approved prove insufficient before construction is begun or completed. There will be times when a city is just . . . out of luck.

It would be bad enough if all this were the Court's concoction, but what is worse, the Court blames it on the Legislature. Requiring cities to risk either public revenue or public health, or both, in approving development is all the Legislature's idea. And this, says the Court, is clear from "the plain language" of Sections 212.133 and 212.135 of the Local Government Code.[3] What is missing from the Court's analysis — which turns on the meaning of one word, "and" — is any thought that there ought to be some *rationale* for its interpretation of these statutes, or what that rationale might be. The words are crucial, to be sure, but they are the product of a legislative process, the hallmark of which is not precision but purpose. To address the reality that even the most carefully chosen words may be misunderstood, the Legislature has stated that "[i]n enacting a statute," it intends "a

_____

[3] *Ante* at ___.

2

just and reasonable result".[4]  Requiring cities to waste tax dollars? Polluting streets and waterways? Stalling economic growth?  Those are the possible results of the Court's statutory interpretation. Which does it think are reasonable?

Fidelity to text is achieved more by discerning its purpose than by parsing its grammar.  In my view, the Court misreads the statutory text in this case, but its error is not merely grammatical. The Court refuses to be guided in its interpretation by legislative purpose, and that systemic failing will affect — is affecting — other cases.

The essential facts of this case are simple.  Several months after the Lorena City Council approved BMTP Holdings' plat for the latest phase of its residential development, the City's engineering firm reported that if the sewage volume continued to increase, the system could become overloaded, violate state regulations, and send excess sewage into nearby water sources.  The City Manager had known all along that the sewer system was inadequate but was not aware a crisis was brewing.  Following the engineer's recommendation, the City adopted a moratorium on sewer tap permits, preventing homes constructed on BMTP's lots from connecting to the sewer system.  When BMTP pointed out that it had already sold fifteen of the vacant lots to homebuilders, the City exempted those lots from the moratorium, but it refused to exempt BMTP's seven unsold lots.  Two years later, after trying unsuccessfully to sell residential lots without sewer connections, BMTP sued for a declaration that the moratorium was invalid under Chapter 212 of the Local Government Code, and for damages, alleging inverse condemnation.

---

[4] TEX. GOV'T CODE § 311.021(3).

3

Sections 212.133[5] and 212.135[6] provide that a city may not adopt a moratorium on property development to prevent a shortage of essential public facilities unless it makes findings on two subjects. One is "the extent of need beyond the estimated capacity of existing essential public facilities that is expected to result from new property development".[7] The other is that

the moratorium is reasonably limited to:

(A)     areas of the municipality where a shortage of essential public facilities would otherwise occur; and

---

[5] "A municipality may not adopt a moratorium on property development unless the municipality: (1) complies with the notice and hearing procedures prescribed by Section 212.134; and (2) makes written findings as provided by Section 212.135, 212.1351, or 212.1352, as applicable." TEX. LOCAL GOV'T CODE § 212.133.

[6] Section 212.135 applies if a municipality faces a shortage of facilities and states:

"(a) If a municipality adopts a moratorium on property development, the moratorium is justified by demonstrating a need to prevent a shortage of essential public facilities. The municipality must issue written findings based on reasonably available information.

"(b) The written findings must include a summary of:

"(1) evidence demonstrating the extent of need beyond the estimated capacity of existing essential public facilities that is expected to result from new property development, including identifying:

"(A) any essential public facilities currently operating near, at, or beyond capacity;

"(B) the portion of that capacity committed to the development subject to the moratorium; and

"(C) the impact fee revenue allocated to address the facility need; and

"(2) evidence demonstrating that the moratorium is reasonably limited to:

"(A) areas of the municipality where a shortage of essential public facilities would otherwise occur; and

"(B) property that has not been approved for development because of the insufficiency of existing essential public facilities."

*Id*. § 212.135.

[7] *Id*. § 212.135(b)(1).

4

        (B)     property that has not been approved for development because of the insufficiency of existing essential public facilities.[8]

The Court treats (A) and (B) as conditions which must both be met for a moratorium to apply in an area, based on their joinder by "and". The problem with this interpretation is that (B) is a complete subset of (A): the areas of town where shortages will occur include every area where development has not been approved because of existing shortages. Because (A) includes areas not in (B), and all areas in (B) are in (A), if both (A) and (B) must be met, then only (B) must be met. That is what the Court concludes.

This interpretation is flawed in two respects. It reads (A) out of the statute. Section 212.135(b)(2) would mean exactly the same thing if (A) were omitted. This violates the principle that all words of a statute be given effect and not treated as mere surplusage.[9] But more importantly, it makes nonsense of the statute. The need for a moratorium in the (B) areas is not immediate; development there has already been halted due to existing shortages. All the (A) areas need the moratorium, not just those which are also (B) areas. In the Court's view, the Legislature prohibited cities from halting development except when it is already halted. Legislature to cities: you can protect the public from a loss of essential services, but only if protection is unnecessary.

Subsection (B) is better read as a specific instance of (A). It is not surplusage; it emphasizes one area included in (A). I suspect the Court would agree if the specific preceded the general, limiting a moratorium to "property that has not been approved for development because of the

---

[8] *Id.* § 212.135(b)(2).

[9] *E.g. Chevron Corp. v. Redmon*, 745 S.W.2d 314, 316 (Tex. 1987) ("We will give effect to all the words of a statute and not treat any statutory language as surplusage if possible.").

insufficiency of existing essential public facilities" *and* (*i.e.*, as well as) "areas of the municipality where a shortage of essential public facilities would otherwise occur". The specific illustrates or emphasizes an example of the general but does not limit the general; otherwise, the general would be irrelevant. Beginning with the general does not alter the meaning. For example, where a 60 mph speed limit for trucks is lower than the limit for other vehicles, a statute imposing the 60 mph limit for "vehicles and trucks" or "trucks and vehicles" accomplishes the same thing: reducing the speed limit for all vehicles to the current limit for trucks. A reasonable drafter could choose to include trucks specifically to point out that the difference in the legal limits has been removed. It would be unreasonable to suppose that the drafter intended by the phrase that the 60 mph limit would apply only to vehicles that are also trucks, thereby accomplishing nothing.

The Court's focus on the areas covered by a permissible moratorium is misdirected. Surely it goes without saying that a moratorium should be imposed on development only where essential public facilities are threatened. The Legislature's obvious purpose in enacting Sections 212.133 and 212.135 was not to limit *where* a moratorium on development can be imposed but *how* one can be imposed. By mandating a process in which a moratorium cannot be adopted without making specific findings justifying its necessity, the Legislature has deprived cities of the power to act for general policy reasons, or simply because they can. Absent the required fact-finding supported by evidence, a moratorium is prohibited. Not all the ordinances adopted by the City of Lorena may have complied with the statutes, but the final ordinance, which is the one the Court thinks matters, found that

(1)     any new sewer connections will push the Lorena Wastewater Treatment Plant further beyond its capacity;

6

(2)     operating beyond the capacity of the Lorena Wastewater Treatment Plant may result in failure of the entire plant, thereby causing all residents of the City currently connected to the Lorena Wastewater Treatment system to lose service; and

(3)     operating beyond the capacity of the Lorena Wastewater Treatment Plant may result in illegal discharges from the plant, thereby subjecting the City to fines and penalties from the State of Texas and/or the federal government.

The Court does not consider these findings to be unsupported by the evidence or inadequate to support the moratorium. In fact, they are not pretextual; the City has been attempting to increase the sewage services available to its residents since the first moratorium.

Reasonably read, and completely unsurprisingly, Sections 212.133 and 212.135 do not prohibit cities from halting development, whether previously approved or not, to ensure essential public services for its residents, as the City did in this case. The surprise is that the Court reaches the opposite conclusion.

The Court also concludes that because the City's moratorium was invalid, BMTP has a viable takings claim. But valid or not, the threat to the public remains. One element of a takings claim, as the Court acknowledges, is that BMTP has been deprived of its reasonable, investment-backed expectations in the use of its seven lots.[10] BMTP's expectations, the Court says, were that it "would be able to sell the lots to builders once the subdivision was completed, as it had done for the previous lots".[11] But sewer services available for the previous lots have come to be inadequate. No investor

---

[10] *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (significant factors include "the extent to which the regulation has interfered with distinct investment-backed expectations"); *Sheffield Dev. Co., Inc. v. City of Glenn Heights*, 140 S.W.3d 660, 672-673 (Tex. 2004) (quoting and discussing *Penn Central*).

[11] *Ante* at ___.

can reasonably expect that, having begun to develop his property without risk to the public, he will be entitled to continue that development when the risk arises. For that reason, a takings claim is unlikely to succeed. I think what the Court means is that it is reasonable to expect that approval of development guarantees that essential services will be available when needed. The Court's view, for now at least, is that the consequences of post-approval exigencies should reasonably be expected to fall on the public, not a landowner. This position flows from the Court's view that the Legislature has prohibited cities from halting approved development to protect public health and safety. But no authority supports such a view, and in the unlikely event BMTP should persuade a jury to award it damages against the City for trying to protect its citizens from having to drink improperly treated wastewater, I doubt the Court will adhere to that position.

I respectfully dissent.

_____
Nathan L. Hecht
Justice

Opinion delivered: August 30, 2013